**DOCKETED**

DEC 2 3 2003

FILED

DEC 2 2 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TRANSPERSONNEL, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 03 C 00611 |
| ROADWAY EXPRESS, INC., a Delaware Corporation, | ) ) ) | Judge St. Eve |
| Defendant. | ) | |

## PLAINTIFF TRANSPERSONNEL, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff, Transpersonnel, Inc., by its attorneys, Mark A. Spognardi and

Phillip M. Schreiber of the law firm Holland & Knight LLC, states for its

Memorandum of Law in Support of its Motion for Summary Judgment as follows:

### INTRODUCTION

Prior to May 2, 1986, Roadway Express needed to have a ready source of

drivers to cover short term shortages of its own drivers. With this objective in mind,

Roadway Express approached Transpersonnel to enter into an agreement that

would allow Roadway Express to lease drivers from Transpersonnel. Roadway

Express intended to supervise and control the day-to-day operations of the leased

drivers. Furthermore, Roadway Express intended to cover all costs associated with

the leased drivers, including costs associated with contributions to be made for the

benefit of or on behalf of the leased drivers to the Local 705 International

Brotherhood of Teamsters Pension Fund ("Pension Fund"). (Plaintiff's Statement of
Undisputed Material Facts ("PMF"), ¶¶ 1-8).

Transpersonnel was amenable to Roadway Express' proposal. On May 2,
1986, Roadway Express entered into a written agreement with Transpersonnel
whereby, *inter alia*, Transpersonnel agreed to supply (lease) drivers to Roadway
Express for Roadway Express to utilize in its common carriage operations (the
"Agreement"). The Agreement obligated Roadway Express to reimburse
Transpersonnel for,

> all for all applicable employee benefits, including health, welfare and
> pension fund contributions, and other similar items paid to or on
> behalf of Lessor's employees as a result of a union agreement
> obligation, including benefits furnished, paid, or accruing to or for the
> account of such employees as a result of any statute, regulation or rule
> related to such agreement, benefit or payment.

The Agreement further provided that this obligation by Roadway Express survives
the termination of the Agreement. (PMF, ¶¶ 9, 15).

Transpersonnel, as a signatory to a collective bargaining agreement with
Local 705, International Brotherhood of Teamsters, was required to make
contributions to the Pension Fund. Roadway Express' termination of its Agreement
with Transpersonnel in 1992 resulted in the occurrence of a partial withdrawal
from the Pension Fund, thereby giving rise to withdrawal liability. (PMF, ¶¶ 36-39).

Central to this case is whether Roadway Express is an employer, along with
Transpersonnel, for purposes of the Multiemployer Pension Plan Adjustment Act
("MPPAA"). As aptly explained by Judge Coar in *Local 705, International
Brotherhood of Teamsters Pension Trust Fund v. Packey, Inc.*, 1997 WL 724548, *5

(N.D. Ill. 1997), "When an employer withdraws from a pension plan fund and leaves it partially unfunded, it must pay withdrawal liability as assessed by the fund...." It is for the Court to decide whether Roadway Express is an employer for MPPAA purposes. *Id.* at *4-*5, and cases cited therein. Therefore, if Roadway Express is a MPPAA employer, it shares in responsibility with Transpersonnel for a portion of Transpersonnel's withdrawal liability.

As demonstrated below, Roadway Express is a MPPAA employer. Roadway Express and Transpersonnel jointly employed the leased drivers and Roadway Express had a contractual obligation to cover the Pension Fund contributions. Transpersonnel was merely the conduit through which those payments would be made.

Independent of Roadway Express' MPPAA employer status, Roadway Express is contractually obligated to reimburse or indemnify Transpersonnel for any withdrawal liability attributable to Roadway Express' termination of the Agreement. Accordingly, entry of summary judgment in favor of Transpersonnel is warranted.

## ARGUMENT

## I.   ROADWAY EXPRESS IS A MPPAA EMPLOYER.

Count I of the Complaint seeks a declaration that Roadway Express is a MPPAA employer. MPPAA "does not define the term 'employer.'" *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 85 F.3d 1282, 1287 (7th Cir. 1996). Nevertheless, the Seventh Circuit has defined an

employer for purposes of MPPAA as "a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." *Id*. Thus, according to the Seventh Circuit, "the appropriate inquiry is whether the alleged employer had an obligation to contribute as well as the nature of that obligation." *Id*.

The Seventh Circuit's definition of a MPPAA employer is identical to that used by several other circuit courts. *See e.g. Korea Shipping Corp. v. NYSA-ILA Pension Trust Fund*, 880 F.2d 1531, 1537 (2d Cir. 1989); *Carriers Container Council, Inc. v. Mobile Steamship Assoc. Inc.*, 896 F.2d 1330, 1343 (11th Cir. 1990). This definition is drawn from the definition of "employer" found in Title I of ERISA. *Bowers v. Andrew Weir Shipping, Ltd.*, 27 F.3d 800, 804 (2d Cir. 1994); *Carriers Container Council*, 896 F.2d at 1343. The MPPAA employer-employee relationship is broader in scope than the common law relationship described by the Supreme Court in *Nationwide Mutual Insur. Co. v. Darden*, 503 U.S. 318 (1992). *Bowers*, 27 F.3d at 804.

### A. Roadway Express was a Joint, Direct Employer of the Leased Drivers.

The first step in the MPPAA employer status analysis is to determine whether Roadway Express is an employer of the leased drivers along with Transpersonnel. MPPAA allows for joint employer status. *Central Pennsylvania Teamster's Pension Fund v. Service Group, Inc.*, 645 F. Supp. 996, 998 (E.D. Penn. 1985). The factors utilized to determine whether a party is a joint-employer are: "(1) supervision of employees' day- to-day activities; (2) authority to hire or fire

employees; (3) promulgation of work rules and conditions of employment; (4) issuance of work assignments; and (5) issuance of operating instructions." *Teamsters Local Unions Nos. 75 and 200 v. Barry Trucking, Inc.*, 176 F.3d 1004, 1008 (7th Cir. 1999).

Utilizing these factors, as a matter of law, Roadway Express was a joint employer with Transpersonnel with respect to the leased drivers. Roadway Express exercised near absolute control over the leased drivers. Roadway Express selected which drivers it would use from Transpersonnel. In fact, Roadway Express often referred its qualified job applicants to Transpersonnel so that Roadway Express would have a ready source of drivers of its own choosing. Roadway Express required the applicants it referred to Transpersonnel complete Roadway Express' employment application. Roadway Express then conducted its own extensive screening and pre-employment testing of the applicants who ultimately were referred to Transpersonnel. Roadway Express had first priority in using those referrals when it needed drivers from Transpersonnel. (PMF, ¶¶ 6, 20-22). Roadway Express often directly hired the leased drivers. (PMF, ¶ 35).

Roadway Express also exercised exclusive supervision and control over the day-to-day activities of the leased drivers. The leased drivers completed the same Roadway Express paperwork as the regular drivers. The leased drivers went through the same Roadway Express pre-trip procedures as the regular drivers. The leased drivers drove Roadway Express' vehicles. The leased drivers followed the same Roadway Express codes of conduct (*e.g.*, cash handling procedures, dress code

and attendance) as the regular drivers. The leased drivers received their route assignments from Roadway Express in the same manner as the regular drivers. Roadway Express shared responsibility with Transpersonnel for insuring that the leased drivers complied with all relevant federal and state laws. In short, the leased drivers performed the same job duties at Roadway Express as the regular drivers, in the same manner as the regular drivers and under the supervision and control of Roadway Express. (PMF, ¶¶ 23-33).

Finally, if Roadway Express became dissatisfied with a leased driver, it had the ability to cause that driver to cease reporting to Roadway Express. (PMF, ¶ 34).

Utilizing the factors for a joint employer relationship set forth in *Barry Trucking, supra,* Roadway Express is a joint employer with Transpersonnel with respect to the leased drivers. Roadway Express supervised the leased drivers' day-to-day activities. Roadway Express had the authority to hire or fire the leased drivers (at least with respect to its facility). Roadway Express promulgated the work rules and conditions of employment under which the leased drivers operated. Roadway Express issued the leased drivers their work assignments. Roadway Express issued the leased drivers their operating instructions (*e.g.*, the paperwork and pre-trip checks which needed to be completed). Roadway Express also provided all equipment (*e.g.*, the trucks) and supplies (*e.g.*, fuel) needed by the leased employees.

## B. Roadway Express Contractually Obligated Itself to Contribute to the Pension Fund with Respect to the Leased Drivers.

The second step in the MPPAA employer status analysis is to examine whether Roadway Express had a contractual obligation to contribute to the Pension Fund. The Agreement between Roadway Express and Transpersonnel obligated Roadway Express to contribute to the Pension Plan with respect to the leased drivers. *American Stevedoring Corp. v. Burlington Indus., Inc.*, 1985 WL 5057 (N.D. Ill. 1985), involved a nearly identical factual situation to this case.[1] American Stevedoring Corporation ("ASC") leased truck drivers to Burlington. ASC was the signatory to the relevant collective bargaining agreement and, pursuant to that CBA, was obligated to make payments to the union's pension fund on behalf of its employees. Burlington, through its contract with ASC, was obligated to reimburse ASC for the payments ASC made to the pension fund on behalf of the employees leased to Burlington. *Id.* at *1.

The issue to be decided in *American Stevedoring* was whether ASC or Burlington was a MPPAA employer for purposes of withdrawal liability. Judge Hart held that both parties were MPPAA employers. *Id.* Judge Hart reasoned that Burlington's contractual obligation to pay ASC what ASC contributed to the pension fund on behalf of the employees leased to Burlington was a "clear example" of an entity "acting indirectly in the interest of an employer in relation to an employee

---

[1] *American Stevedoring* was decided prior to the Seventh Circuit's decision in *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 85 F.3d 1282, 1287 (7th Cir. 1996). Nevertheless, the analysis used by the *American Stevedoring* Court is still viable because the definition of a MPPAA employer used by the Court is consistent with the definition adopted later by the Seventh Circuit.

benefit plan." *Id.* In other words, Burlington had an obligation to contribute to the pension fund (albeit indirectly) in the interest of ASC's leased employees.

Just as Burlington was required to contribute to the pension fund through ASC in *American Stevedoring*, Roadway Express was obligated to contribute to the Pension Fund through Transpersonnel in this case. Accordingly, just as Burlington was a MPPAA employer in *American Stevedoring*, Roadway Express is a MPPAA employer in this case.

**C.      Roadway Express' Status as a Joint Employer, Combined with Its Contractual Obligations, Make It a MPPAA Employer.**

Based on the foregoing, Roadway Express meets the Seventh Circuit's definition of a MPPAA employer. Roadway Express is a MPPAA employer because (1) it is a direct employer of the Pension Plan's participants and (2) it is contractually obligated to make contributions to the Pension Fund. *See Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 85 F.3d 1282, 1287 (7th Cir. 1996).

As a joint employer of the leased drivers, along with Transpersonnel, Roadway Express is a direct employer of the Pension Plan's participants. The Agreement between Roadway Express and Transpersonnel made Roadway Express contractually obligated to make contributions to the Pension Find on behalf of the leased employees. Transpersonnel merely was the cash conduit for Roadway Express' contributions to the Pension Fund. The mere fact that Transpersonnel acted as an intermediary to collect contributions to the Pension Plan from Roadway Express does not negate Roadway Express' status as a MPPAA employer. *See Korea*

*Shipping Corp. v. New York Shipping Association-International Longshoremen's Ass'n Pension Trust Fund*, 880 F.2d 1531, 1539-40 (2d Cir. 1989). Roadway Express' Agreement with Transpersonnel does not act to insulate it from its MPPAA obligations. Accordingly, entry of Summary Judgment on Count I of the Complaint is warranted.

### D. Alternatively, Roadway Express is a Common Law Employer of the Leased Drivers, Thereby Making it a MPPAA Employer.

As discussed above, the MPPAA definition of employer is <u>broader</u> than the common law definition of employer. *Bowers v. Andrew Weir Shipping, Ltd.*, 27 F.3d 800, 804 (2d Cir. 1994). Accordingly, if Roadway Express falls within the more narrow common law definition of "employer" with respect to the leased employees, then it meets the more encompassing definition of "employer" under MPPAA. The undisputed material facts establish that Roadway Express is a common law employer.

As demonstrated above and in Transpersonnel's Statement of Undisputed Material Facts, Roadway Express had the power to direct and supervise the day-to-day activities of the leased drivers. (PMF, ¶¶ 23-33). This is the cornerstone of a common law employer-employee relationship. *Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 438 (7th Cir. 1996).

The District Court in *Central Pennsylvania Teamster's Pension Fund v. Service Group, Inc.*, 645 F. Supp. 996 (E.D. Penn. 1985), faced with a nearly identical set of facts, held that the lessee and lessor were joint employers under MPPAA. *Id.* at 998. In that case, the pension fund sued Service Group, Inc. for

9

withdrawal liability. Service Group, in turn, sued Harley Davidson York, Inc., claiming it was the MPPAA employer who should bear the withdrawal liability.

Service Group, the signatory to the collective bargaining agreement giving rise to the pension fund contribution obligation, provided trucking services to Harley Davidson York. Nevertheless, Harley Davidson York retained significant involvement in the management of the trucking services provided by Service Group. Harley Davidson York (i) retained the ability to pick and choose the drivers it wanted from among those sent to it by Service Group; (ii) retained front-line responsibility for disciplinary actions against employees; (iii) formulated the work rules under which the Service Group drivers operated; and (iv) retained day-to-day control over the Service Group drivers sent to it. 645 F. Supp. at 998. The District Court ruled that this retention of day-to-day control over the Service Group drivers was the most important factor to finding that Harley Davidson York was a MPPAA employer. *Id.*

Following *Service Group*, and applying *Ost*, as a matter of law the leased drivers were common law employees of Roadway Express. Accordingly, Roadway Express is encompassed within the broader definition of a MPPAA employer with respect to the leased employees. Entry of summary judgment on Count I of the Complaint.

10

## II. ROADWAY EXPRESS IS CONTACTUALLY OBLIGATED TO REIMBURSE TRANSPERSONNEL FOR ITS WITHDRAW LIABILITY ASSOCIATED WITH THE DRIVERS LEASED TO ROADWAY EXPRESS.

Count II of the Complaint alleges that Roadway Express has an independent contractual obligation to reimburse Transpersonnel for any withdrawal liability assessed against it which is attributable to the leased drivers. To sustain a breach of contract action under Illinois law, Transpersonnel must establish that (1) a contract exists between itself and Roadway Express; (2) Transpersonnel performed its obligations under the contract; (3) Roadway Express did not perform its obligations under the contract; (4) an injury or damages occurred as a result of the breach. *XCO Intern. Inc. v. Pacific Scientific Co.*, 255 F. Supp. 2d 825, 832 (N.D. Ill. 2002).

The first, second and fourth elements of Transpersonnel's breach of contract claim have been established as a matter of law. It is undisputed that a contract exists between Roadway Express and Transpersonnel – the Agreement which Roadway Express admits in its Answer was entered into by the parties. Likewise, Transpersonnel performed all of its obligations under the Agreement. Transpersonnel will sustain substantial monetary damages if Roadway Express fails to fulfill an obligation to reimburse Transpersonnel for that portion of its withdrawal liability relating to the leased drivers.

The relevant language of the Agreement provides,

Lessee agrees to reimburse Lessor, at cost, for all applicable employee benefits, including health, welfare and pension fund contributions, and other similar items paid to or on behalf of Lessor's employees <u>as a</u>

11

<u>result of a union agreement obligation</u>, including benefits furnished, paid, or accruing to or for the account of such employees <u>as a result of any statute</u>, regulation or rule related to such agreement, benefit or payment. (Emphasis added).

(PMF, ¶ 15).

Thus, the Agreement expressly requires Roadway Express to reimburse Transpersonnel for any amounts paid on behalf of Transpersonnel's employees as a result of a union agreement obligation, including those which arise as a result of a statute. A portion of the withdrawal liability the Pension Fund is seeking from Transpersonnel arises from (1) the benefits paid to the or on behalf of the leased drivers as a result of a collective bargaining agreement and (2) MPPAA, a statute. Accordingly, Transpersonnel's withdrawal liability falls squarely within Roadway Express' contractual reimbursement obligation.

As succinctly and recently explained by the Seventh Circuit in *Rizzo v. Pierce & Associates*, ___ F.3d ___, 2003 WL 22928873, *2 (7th Cir. 2003):

> Interpretation of an unambiguous contract is a question of law. *Bechtold v. Physicians Health Plan of N. Ind., Inc.*, 19 F.3d 322, 325 (7th Cir.1994) (citing *Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 602 (7th Cir.1989)). "A term is ambiguous if it is subject to reasonable alternative interpretations." *Hickey v. Staley Mfg.*, 995 F.2d 1385, 1389 (7th Cir.1993) (quoting *Taylor v. Continental Group*, 933 F.2d 1227, 1232 (3d Cir.1991)). Therefore, "if the language of the contract unambiguously provides the answer to the question at hand, the inquiry is over." *LaSalle Nat'l Bank v. Service Merchandise Co.*, 827 F.2d 74, 78 (7th Cir.1987).

The Agreement, without ambiguity, provides that Roadway Express must reimburse Transpersonnel for that portion of the withdrawal liability related to the leased drivers. Accordingly, following *Rizzo*, because the language of the Agreement "unambiguously provides the answer to the question at hand, the inquiry is over."

Entry of summary judgment in favor of Transpersonnel on Count II of the Complaint is warranted.

## CONCLUSION

For all of the forgoing reasons, entry of summary judgment in favor of Transpersonnel, Inc. and against Roadway Express, Inc. is warranted.

TRANSPERSONNEL, INC.

By: *Phillip M Schreiber*

One of Its Attorneys

Mark A. Spognardi
Phillip M. Schreiber
HOLLAND & KNIGHT LLC
131 South Dearborn, 30th Floor
Chicago, Illinois 60603
(312) 263-3600

# 1473185_v1

13

1997 WL 724548
(Cite as: 1997 WL 724548 (N.D.Ill.))

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois.

**LOCAL 705, INTERNATIONAL BROTHERHOOD OF TEAMSTERS PENSION TRUST FUND,**
Plaintiff,
v.
**PACKEY, INC., an Illinois Corporation; Packey, Inc. d/b/a Economy Service Stations, an Illinois Corporation, Economy Service Stations, the trade name of Packey, Inc.; Economy Service Stations, Inc., an Illinois Corporation,**
Defendants.

No. 96 C 2330.

Nov. 10, 1997.

MEMORANDUM OPINION AND ORDER

COAR, J.

**\*1** Before the court are plaintiff Local 705, International Brotherhood of Teamsters Pension Trust Fund's ("plaintiff") motion for summary judgment against the defendants, Packey, Inc., ("Packey") and Economy Service Stations, Inc. ("Economy") (collectively "defendants") to compel payment of withdrawal liability and liquidated damages under the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 132(g)(2) and 1451(b) and (e), and Economy's motion for summary judgment against the plaintiff. For the following reasons, the plaintiff's motion will be GRANTED against both defendants and Economy's motion will be DENIED.

I. Facts

The plaintiff is a multi-employer benefit plan within the meaning of §§ 3(3) and 3(37) of ERISA. (Plf.'s 12(M) Stmt. ¶ 1.) In a letter dated August 14, 1995, the plaintiff served a Notice and Demand for Payment of Withdrawal Liability on "Economy Service Stations, Inc." at the address for Packey, Inc. (Plf.'s 12(M) Stmt. ¶ 2; Plf.'s Ex. A.) This letter assessed an initial amount of $116,798.16, requested either immediate payment or payment according to a schedule included with the letter, stated that in the event of a failure to make a payment when due, the plaintiff may require immediate payment of the balance of the liability due, and stated that there may be additional withdrawal liability during the Plan Year ending January 31, 1996 and that the plaintiff would advise defendants of any additional liability once actuarial determinations were available. (Plf.'s 12(M) Stmt. ¶ 2; Plf.'s Ex. A.) [FN1]

FN1. Packey admits that it received the August 14, 1995 letter but that the Notice did not notify "Defendants" that they may have incurred additional withdrawal liability or that the plaintiff would notify the defendants when actuarial information becomes available. However, as the letter containing the language regarding the additional withdrawal liability was sent to and received by Packey at Packey's address, and as Packey's owner and sole shareholder signed a collective bargaining agreement with plaintiffs "on behalf of Economy Service Stations, Inc.," Packey has no factual basis for disputing this fact. (Packey's Ans. to Plf.'s Compl. ¶ 8.) Economy disputes that it was "served" with any of the notices and demands. As discussed later in this opinion, "service" is irrelevant in the context of this Notice and Demand; Economy has not and cannot dispute that it received actual notice via letters to its attorney, Sherwin J. Malkin. (See, e.g., Plf.'s 12(M) Stmt. ¶ 3.) Additionally, in its Answer to the Complaint, Economy has acknowledged service and receipt of notices. (Economy Ans. ¶¶ 9, 11, 13, 14, 18.)

In a letter to the plaintiff dated August 29, 1995, attorney Sherwin J. Malkin ("Malkin") responded to the August 14 letter; in this letter, Malkin indicated that the correct name of the corporation was "Packey, Inc. (d/b/a Economy Service)." (Plf.'s 12(M) Stmt. ¶ 3.) By letter dated October 16, 1995, plaintiff responded to Malkin's August 29 letter; in this letter, the plaintiff indicated that the August 14 letter "applied to, and constituted notice of the obligation to pay withdrawal

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



liability, all members of any controlled group of trades or businesses of which Economy Service Stations, Inc. is or was a member" and stated that even if "Economy Service Stations, Inc" is a trade name, the August 14 letter was addressed to and received by the "corporate entity using that trade name." (Plf.'s 12(M) Stmt. ¶ 4; Plf.'s Ex. C.) The August 29 letter, which was carbon copied to Economy Services Stations, Inc. and to Packey, Inc. (d/b/a Economy Service), stated that the withdrawal liability payments' were to be made in accordance with the August 14 letter. (Plf.'s 12(M) Stmt. ¶ 4; Plf.'s Ex. C.) Joan Baulos, President and Agent for Service of Packey signed a check, drawn on the account of "Packey, Inc. D.B .A. Economy Service," for $116,798.16 paid to the order of the plaintiff, dated November 2, 1995, and delivered to the plaintiff. (Plf.'s 12(M) ¶ 5.) Plaintiff acknowledged receipt of the $116,798 .16 payment by letter dated November 8, 1995 and reiterated "the understanding that Economy Service Stations, Inc. will be liable for any additional withdrawal liability that may have occurred in the Plan Year ending January 31, 1996" and that an assessment for the additional liability would be made once actuarial determination becomes available; this letter was addressed to Malkin and carbon copied to Economy Service Stations, Inc. and to Packey, Inc. (d/b/a Economy Service)." (Plf.'s 12(M) Stmt. ¶ 6; Exh. D.) [FN2]

> FN2. Packey "admits that Exhibit D exists but because this letter was directed to Mr. Malkin, Economy's attorney, Packey has insufficient information or knowledge to admit or deny the allegations in this paragraph." (Packey Ans. ¶ 6.)

*2 In a letter dated January 9, 1996, addressed to Packey, Inc. d/b/a Economy Service Stations and carbon copied to Malkin, the plaintiff assessed additional withdrawal liability in the amount of $149,074.41 and enclosed a payment schedule for monthly payments and stated that "[o]therwise, interest will not accrue if payment of the remaining $149,074.41 is made by March 10, 1996." (Plf.'s 12(M) Stmt. ¶ 7, Exh. E.) It is undisputed that neither of the defendants paid any of the $149,074.41, either as a lump sum

or by giving the first monthly installment by March 10, 1996. (Plf.'s 12(M) Stmt. ¶ 8.) In a letter dated March 25, 1996 and addressed to Packey, Inc. d/b/a Economy Service Stations, the plaintiff notified the defendants that "no payments have been received as of this date" and that the file "has been forwarded to Fund Counsel for legal action." (Plf.'s 12(M) Stmt. ¶ 9.) Neither defendant has made any further withdrawal liability payments to the plaintiff. (Plf.'s 12(M) Stmt. ¶ 10.)

## II. Summary Judgment Standards

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Cox v. Acme Health Serv., Inc., 55 F.3d 1304, 1308 (7th Cir.1995). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir.1995). The movant has the burden of establishing that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 202 (1986); Hedberg v. Indiana Bell Tel. Co. ., 47 F.3d 928, 931 (7th Cir.1995). If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. at 2553. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552-53. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250, 106 S.Ct. at 2511.

On cross-motions for summary judgment, each movant must individually satisfy the requirements of Rule 56. Proviso Association of Retarded Citizens v. Village of Westchester, 914 F.Supp. 1555, 1560 (N.D.Ill.1996); Chicago Truck Drivers, Helpers and Warehouse Workers Union (Ind.) Pension Fund v. Kelly, 1996 WL 507258, *3 (N.D.Ill.1996). Thus, the traditional standards for summary judgment still apply even though both parties have moved for summary judgment. Blum v. Fisher and Fisher, Attorneys at Law, 961 F.Supp. 1218, 1222 (N.D.Ill.1997). The Court thus considers the merits of each cross-motion separately and draws all reasonable inferences and resolves all factual uncertainties against the party whose motion is under consideration. Chicago Truck Drivers, 1996 WL 507258 at *3.

### III. Economy's cross-motion: Statute of Limitations

*3 In its cross-motion for summary judgment, [FN3] Economy argues that the plaintiff's suit against Economy is barred by the statute of limitations because Economy ceased operating its trucking business in 1983 and the plaintiff did not file suit against Economy until 1996--13 years later. Under 29 U.S.C. § 1451(f), [FN4] claims accrue when a payment due to a pension fund, e.g., the withdrawal liability, becomes overdue. Central States, Southeast and Southwest Areas Pension Fund v. Navco, 3 F.3d 167, 172 (7th Cir.1993), cert. denied, 510 U.S. 1115, 114 S.Ct. 1062, 127 L.Ed.2d 382 (1994). Thus, Economy is flatly incorrect to argue that the plaintiff's suit is barred by the statute of limitations based on when Economy withdrew from the pension fund. See Central States, Southeast and Southwest Areas Pension Fund v. Mississippi Warehouse Corp., 853 F.Supp. 1053, 1057 (N.D.Ill.1994) ("A cause of action for unpaid withdrawal liability accrues on the date when payment is demanded but not paid, not when withdrawal occurs."). The plaintiff filed this suit on April 19, 1996, just over a

month after the payments at issue became overdue; its suit is clearly within the statutory period of limitations.

FN3. As this court noted when Economy submitted its summary judgment motion and as plaintiff noted in its response to Economy's motion, Economy has failed to fulfill the requirements of Local Rule 12(M). Despite the fact that Economy never remedied its failure, the court will address the merits of Economy's arguments. This decision on the part of the court to address Economy's motion should not be taken as a sign that such failures will be tolerated in the future.

FN4. Economy cited 29 U.S.C. § 1370(f) as the applicable statute of limitations. However, § 1370(f) applies to civil suits regarded termination of single employer plans. Section 1451(f) is the statute of limitations applicable to multi-employer plans. Section 1451(f) states: An action under this section may not be brought after the later of—(1) 6 years after the date on which the cause of action arose, or (2) 3 years after the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action; except that in the case of fraud or concealment, such action may be brought not later than 6 years after the date of discovery of the existence of such cause of action.

### IV. The merits of the cross-motions

Among arguments analogizing (and disanalogizing) of the defendants to the Easter Bunny and to Michael Jordan [FN5] is a serious question regarding this court's ability to determine whether Packey, a party claiming never to have been an employer for purposes of the Multiemployer Pension Plan Adjustment Act ("MPPAA"), was in fact such an employer and whether, absent such a determination, the court can order Packey to pay the withdrawal liability claims. The MPPAA amended ERISA in order "to cure a recurring problem that arose when an employer ceased making payments," to a pension plan fund: namely, that the fund "would be left with vested pension obligations which were only partially funded." Robbins v. Admiral Merchants Motor Freight, 846 F.2d 1054, 1055-56 & n. 1 (7th Cir.1988). When an

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



1997 WL 724548                                                    **Page  5**
(Cite as: 1997 WL 724548, *3 (N.D.Ill.))

employer withdraws from a pension plan fund and leaves it partially unfunded, it must pay withdrawal liability as assessed by the fund; if the employer disputes the fund's determinations, it must "pay now, dispute later" by going through arbitration. 29 U.S.C. §§ 1399(c)(2), 1401(a)(1); Trustees of the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Central Transport, Inc., 935 F.2d 114, 118 (7th Cir.1991) ( "Trustees v. Central Transport "); Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, (4th Cir.1991). If the employer is later found through arbitration to have paid more than it should have paid (or not to be liable at all), the fund must pay back the funds. Trustees v. Central Transport, 935 F.2d at 118-19.

> FN5. The parties, working off of hypotheticals put forward in a court decision and in Packey's brief, seem to treat the Easter Bunny and Michael Jordan as though they were legal terms of art, rather than characters used in hypotheticals to illustrate a point.

While it is true that the MPPAA requires that "Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1281 through 1399 of this title shall be resolved through arbitration," 29 U.S.C. § 1401(a)(1), the plaintiff is incorrect that that precludes the court from determining Packey's employer status. The case law draws a clear distinction between two different questions, one which applies to Packey and one which applies to Economy. As Judge Plunkett stated in Banner Industries, Inc. v. Central States, Southeast and Southwest Areas Pension Fund:

*4 [T]he issue of whether one remains an employer on the date of a withdrawal is not the same issue as whether one ever became an 'employer' for purposes of ERISA generally and MPPAA in particular. The latter is an issue for the court since its resolution determines the arbitrator's authority over the dispute. The former is an issue for the arbitrator since its resolution turns on the applicability of MPPAA provisions relating to employer withdrawals--provisions Congress

specifically placed within the purview of the arbitrator.

657 F.Supp. 875, (N.D.Ill.1987), aff'd, 875 F.2d 1285 (7th Cir .), cert. denied, 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989). This statement of the two questions--and the result reached by Judge Plunkett--was accepted in two of the major cases cited by the plaintiff. Banner, 875 F.2d 1285, 1293 (7th Cir.) (approving of the "excellent legal discussion by the district court" in drawing on this distinction and in determining when a district court should resolve employer status), cert. denied, 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989); Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia, 830 F.2d 1241, 1251-52 (3d Cir.1987) (citing with approval and quoting Banner district court's discussion; stating that the court finds that "distinction to be persuasive."). The Seventh Circuit, among others, has held in case after case, including the other major case cited by the plaintiff, that the question of whether an entity was ever an MPPAA employer is for the court to determine, while the question of whether an MPPAA employer ceased to be such an employer is for the arbitrator to determine. See Central States, Southeast and Southwest Areas Pension Fund v. Slotky, 956 F.2d 1369, 1373 (7th Cir.1992) ( "[T]he issue of membership in a controlled group cannot be within exclusive arbitral jurisdiction."), cert. denied, 511 U.S. 1018, 114 S.Ct. 1399, 128 L.Ed.2d 72 (1994); Central States, Southeast and Southwest Areas Pension Fund v. Progressive Driver Services, Inc., 940 F.Supp. 1311, 1314 (N.D.Ill.1996) ("the issue of whether Progressive was ever an employer is properly before [the court] to decide"). See also Galgay v. Beaverbrook Coal Co., 105 F.3d 137, 141 (3d Cir.1997) (distinguishing "between disputes over whether an entity has ceased to be an employer within the meaning of MPPAA, which must be resolved in arbitration, and disputes over whether an entity has ever become an employer, which must be resolved in the courts") (citing Flying Tiger ); Rheem Manufacturing Co. v. Central States Southeast and Southwest Areas Pension Fund, 63 F.3d 703, 706 (8th Cir.1995)

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

(stating that § 1401 does not apply where entity claims that it never was an employer), cert. denied, 516 U.S. 1146, 116 S.Ct. 1016, 134 L.Ed.2d 96 (1996); Doherty v. Teamsters Pension Trust Fund of Philadelphia and Vicinity, 16 F.3d 1386, 1390 (3d Cir.1994) (citing Flying Tiger to hold that disputes regarding whether an entity has even been an MPPAA employer must be resolved in court, while disputes regarding whether an entity has ceased to be an employer must be resolved in arbitration); Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, 122-23 (4th Cir.1991) (noting that there is a "limited exception" to § 1401 "where the employer claims that it did not become an employer for MPPAA purposes in time to acquire withdrawal liability, or where the employer asserts that it was never an MPPAA employer and thus is not subject to ERISA's dispute resolution procedures; holding that "as long as a withdrawing entity was a part of the control group of an employer subject to the MPPAA at some point in time, and where the issues in dispute fall under provisions explicitly designated for arbitration, the arbitration procedure must be followed."); Bowers v. Transportacion Maritima Mexicana, S.A., 901 F.2d 258, 261 (2d Cir.1990) ("The issue whether TMM was an 'employer' within the meaning of the MPPAA is properly for the courts, not an arbitrator to determine."); Mason and Dixon Tank Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 852 F.2d 156, 164, 167 (6th Cir.1988) (stating that "arbitration is the appropriate forum if there is a dispute concerning whether the employee has completely or partially withdrawn from the pension fund" but that there is an "exception [which] allows a company to bypass arbitration for the limited purpose of determining whether it is an 'employer' within the meaning of section 1401(a)(1)). Thus, the law in this circuit is clear: the court must consider a dispute over whether an entity was ever an MPPAA employer, but the dispute over whether an entity that was an MPPAA employer has ceased to be one must be determined by the arbitrator.

*5 This case demonstrates that dichotomy

perfectly. Packey denies that it was ever an MPPAA employer, and the court will consider that dispute. Economy does not dispute that, at some point in time, it was an MPPAA employer, so the court will not consider its claim that it had ceased to be an employer in 1983. [FN6]

> FN6. This disposes of Economy's claim in its cross-motion for summary judgment that it "is not a proper party defendant since it is not an 'employer' within the meaning of 29 U.S.C. 1002(5)." This claim hinges on whether Economy had ceased to be an employer.

In the end, however, there are no material disputed facts regarding Packey's status as an employer. An MPPAA employer is an entity that had a contractual obligation to contribute to a pension plan fund " 'either as a direct employer or in the interest of an employer of the plan's participants.' " Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc., 85 F.3d 1282, 1287 (7th Cir.1996) (citations omitted) ("Central States v. Central Transport "). Thus, the party " 'who is signatory to a contract creating the obligation to contribute is the 'employer' for purposes of establishing withdrawal liability.' " Id. (citing Rheem, 63 F.3d at 707.) See also Progressive Driver Services, 940 F.Supp. at 1315 (applying Central States v. Central Transport to case where party, which was signatory to a collective bargaining agreement, disputed whether it signed it as an employer or as an "agent" of the "real" employer; finding that being a signatory was sufficient to make a party an MPPAA employer subject to withdrawal liability and to § 1401 arbitration). [FN7] Admissions that Packey made in the pleadings of this case and a related case in this district are sufficient to hold that Packey is an MPPAA employer. (Packey's Amended Ans. ¶ 8 ("Packey admits that Joan Baulos [sole shareholder of Packey] signed on collective bargaining agreement with Local 705 of the International Brotherhood of Teamsters on behalf of Economy Service Stations, Inc."); Plf.'s Ex. G (Packey, Inc.'s Complaint, Packey, Inc. v. Local 705 of the International Brotherhood of Teamsters Pension Fund, No. 96 C 2296), ¶¶ 8



("Economy continued to sign the Joint Area Tank Truck Agreement, covering work performed inside and outside the Chicago metropolitan area for Local 705 ("Union Agreement"). Pursuant to the Union Agreement, the employer was required to make certain payments to the Fund."), 12 ("Pursuant to the Agreement [with Economy], Packey had been making contributions to the Fund on behalf of Economy."). See also Packey, Inc. v. Local 705 of the International Brotherhood of Teamsters Pension Fund, No. 96 C 2296 (slip op., March 28, 1997) (holding that Packey's allegations in its pleadings were sufficient to find that it was an MPPAA employer subject to withdrawal liability and to the arbitration requirement).

> FN7. As Progressive Driver Services makes clear, the fact that Packey claims that another party has a contractual obligation to contribute is irrelevant to the question of whether Packey is an MPPAA employer. 940 F.Supp. at 1315. Thus, that both Packey and Economy are claiming that the "other" defendant is the one who ultimately owes the money is irrelevant to the question of whether they are MPPAA employers.

Because there are no material disputed facts regarding Packey's status as an MPPAA employer, the plaintiff's motion for summary judgment is GRANTED as to Packey.

## V. Economy's Cross-Motion: Notice

Economy's final claim in its cross-motion for summary judgment, and the final possible barrier [FN8] to the plaintiff's motion for summary judgment against Economy, is that Economy was "not given proper notice and demand." While the Seventh Circuit has held that application of the MPPAA requires the pension plan fund to "issue a notice, and a demand for payment, of withdrawal liability to the employer." Slotky, 956 F.2d at 1371. Economy argues that the Notice and Demand letters addressed and delivered to Packey do not count as proper notice to Economy, which is a separate corporation from Packey. However, nothing in the statute or the case law requires that the Notice and Demand be addressed to the employer or otherwise "take

a particular form"; where the employer gets actual notice of liability, that is sufficient. Central States, Southeast and Southwest Areas Pension Fund v. Royal Transport, Ltd., 1997 WL 269594, *1 (N.D.Ill.1997) ("Even if the controlled group member's name is not expressly stated or is misstated, actual notice to the member part that the controlled group is liable is sufficient"). [FN9] Economy has never denied that its attorney, Malkin, received a copy of the initial notice and demand letter (Ptf's Ex. A), was directly sent a letter notifying Economy that withdrawal liability was due (Ptf's Ex. C), was directly sent a letter warning of additional withdrawal liability for the year ending January 31, 1996 (Ptf's Ex. D), and was carbon copied the Notice and Demand letter dated January 9, 1996 assessing the additional withdrawal liability (Ptf's Ex. E.) Quite the contrary: in its Answer to the plaintiff's Complaint, Economy admitted service and receipt of the notices. (Economy's Ans. ¶¶ 9, 11, 13, 14, 18 .)

> FN8. Economy makes one more argument in its response to the plaintiff's motion: That the possibility that Packey might have timely filed for arbitration somehow covers Economy. In view of its claims that it is a separate corporation from Packey, Economy's argument fails. Additionally, the district court in the related case of Packey, Inc. v. Local 705 has ruled that Packey failed to timely demand arbitration. Case No. 96 C 2296 (slip op., March 28, 1997). Finally, the duty to initiate arbitration on Economy's behalf rested squarely on the shoulders of Economy. See Slotky, 956 F.2d at 1373 ("Anyone who suspects that he might be adjudged a member of a controlled group and therefore subjected to withdrawal liability would be well advised to commence arbitration, so that if a court holds that he is a member of such a group and hence is subject to such liability he won't have waived the issues that are reserved for arbitration....").

> FN9. "[N]o meaningful distinction arises where, as here, the defendant is an alleged employer instead of an alleged member of a controlled group, as the purpose of the controlled group inquiry is to determine whether an entity is an employer for purposes of ERISA. 29 U.S.C. § 1301(b)." Progressive Driver Services, 940 F.Supp. at 1313

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



n. 1. Thus, the fact that this and other cases refers to members of a controlled group does not affect the inherent logic of the cases.

*6 The plaintiff's motion for summary judgment as to Economy is GRANTED and Economy's cross-motion for summary judgment is DENIED.

### VI. Conclusion

For the aforementioned reasons, the plaintiff's motion for summary judgment against both defendants is GRANTED and Economy's motion for summary judgment is DENIED. The defendants are both liable for withdrawal liability in the amount of $149,074.41 and for interest, liquidated damages, and attorneys' fees and costs of this action. The plaintiff has 21 days from the date of this order to submit an affidavit for the amount it claims is due. The parties are encouraged to reach an agreement as to what the amount due should be. A status hearing will be set for seven days after the plaintiff's affidavit is due to be filed. This case remains OPEN only to consider damages, attorneys' fees, and costs.

1997 WL 724548, 1997 WL 724548 (N.D.Ill.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois,
Eastern Division.

AMERICAN STEVEDORING CORP., et
al., Plaintiffs,
v.
BURLINGTON INDUSTRIES, INC., et al.,
Defendants.

No. 85 C 4180

December 19, 1985

MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

*1 American Stevedoring Corporation and
its successor TLM, Inc. (hereafter 'ASC') filed
this case against Burlington Industries and
the Chicago Truck Drivers, Helpers &
Warhouse workers Union Pension Fund
('Pension Fund') over a dispute concerning
liability for alleged withdrawal from the
Pension Fund. ASC had 'leased' persons to
Burlington to use as truck drivers in
Burlington's business. On August 8, 1985 this
court denied defendants' motion to dismiss,
finding that although the existence and
amount of withdrawal liability had to be
arbitrated as required by 29 U.S.C. § 1401,
determining whether a party is an employer
within the meaning of the statute (and both
ASC and Burlington claim they are not) is a
question for the court. The parties have now
briefed that question and it is ready for
decision.

The term 'employer' is not defined in
subchapter III of ERISA, which contains the
statutory sections relevant to this case. It is
defined, however, in subchapter I (29 U.S.C. §
1002(5)) as follows:

The term 'employer' means any person
acting directly as an employer, or indirectly
in the interest of an employer, in relation to
an employee benefit plan; and includes a
group or association of employers acting for
an employer in such capacity.

ASC argues that this definition is overbroad
and 'wholly inadequate' for the purposes of
subchapter III, but gives no reason to support
that claim. One court has rejected that
argument and held § 1002(5) applicable to
subchapter III. Central Pennsylvania
Teamster's Pension Fund v. Service Group,
Inc., 6 E.B.C. 1491, 1492 (E.D.Pa. 1985). In
several other instances the § 1002(5) definition
has been applied to questions arising under
subchapter III without considering whether
that was proper. Dorn's Transportation, Inc.
v. Teamsters Pension Trust Fund, 596 F.Supp.
350, 352-53 (D.N.J. 1984); Bennett v.
Machined Metals Co., 591 F.Supp. 600, 608
(E.D.Pa. 1984); Miami Valley Carpenters v.
United States Fidelity & Guaranty Co., 590
F.Supp. 61, 66 (S.D.Ohio 1984); Combs v.
Indyk, 554 F.Supp. 573, 575 (W.D.Pa. 1982).
ASC's cases, on the other hand, are obviously
distinguishable as involving a very different
question: whether someone was an 'employee'
under a written pension plan. See Wardle v.
Central States Southeast & Southwest Areas
Pension Fund, 627 F.2d 820, 824-25 (7th
Cir.1980); Torrence v. Chicago Tribune Co.,
535 F.Supp. 743 (N.D.Ill. 1981); Richardson v.
Central States Southeast & Southwest Areas
Pension Fund, 645 F.2d 660, 662 n.2 (8th Cir.
1981); Hammond v. James W. Griffin Co., 520
F.Supp. 162 (N.D.Ga. 1981). This court sees
no reason not to apply what is obviously the
most relevant definition of employer and
therefore takes § 1002(5) as setting forth the
proper definition. [FN1]

Given that definition, this court has no
hesitation in holding both ASC and
Burlington to be employers for purposes of
determining withdrawal liability. ASC does
not dispute that it was obligated by its
collective bargaining agreement to make
payments to the Pension Fund on behalf of its
employees; it is difficult to imagine a more
classic example of 'acting directly as an
employer . . . in relation to an employee
benefit plan.' Burlington does not dispute
that by its contract with ASC it was obligated
to reimburse ASC for the payments ASC made
to the Pension Fund on behalf of the
employees Burlington 'leased.' Again, that is
a clear example of 'acting indirectly in the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



interest of an employer in relation to an employee benefit plan.' The phrase 'in relation to an employee benefit plan' is obviously broad and there are probably situations in which it would be difficult to tell whether what a person or entity was doing in relation to an employee benefit plan should be characterized as an act an employer would do. This case, however, is very simple. Whatever else 'employers' do 'in relation to an employee benefit plan,' they certainly are the ones making payments to the plan on behalf of the plan's beneficiaries. [FN2]

*2 Burlington argues that a Pension Benefit Guarantee Corporation ('PBGC') opinion letter dated December 27, 1985 interprets § 1002(5) in a way that, if followed, would result in ASC being the sole employer. That two-page letter [FN3] is apparently an advisory opinion and as such contains sketchy facts. Nonetheless, it appears similar to this case in that the question posed was which of two parties was the 'employer' for purposes of withdrawal liability: the party who would count as the employer under common law rules or the party obligated to make the pension payments (here, that party is ASC). However, the PBGC did not decide precisely that question. Instead, the PBGC advised that the amount of withdrawal liability would be determined from the amount a party had been required to contribute to the plan and for a party that was not required to contribute anything the amount of liability would be zero. The PBGC letter handles the question by addressing the amount of withdrawal liability assuming that a party is an employer and therefore is not helpful here.

ASC argues that the Pension Fund should be estopped from collecting the withdrawal liability because the union representing those persons ASC supplied to Burlington was itself the cause of the withdrawal. Whether that argument is valid appears open to question. See Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. Thompson Building Materials, Inc., 749 F.2d 1396, 1406-07 (9th Cir. 1984), cert. denied, 105 S.Ct. 2116 (1985). However, that argument goes to the merits of the withdrawal

liability and is therefore a question for the arbitrator.

Finally, ASC argues that Burlington must, according to their contract, indemnify ASC for any withdrawal payments. Since that claim is not ripe until the liability for withdrawal payments is determined (an issue to be determined by arbitration in the first instance) it cannot be decided.

IT IS THEREFORE ORDERED that plaintiffs American Stevedoring Corporation and TLM, Inc. and defendant Burlington Industries, Inc. are held to be 'employers' for purposes of determining withdrawal liability in this case. The only other remaining issues being subject to mandatory arbitration, the parties are ordered to proceed with arbitration.

APPENDIX A
PENSION BENEFIT GUARANTY
CORPORATION
2020 K Street, N.W., Washington, D.C. 20006
Dec. 27, 1984

§ 4001(b)

4203

4203(a)

4211

This responds to your request for the PBGC's opinion concerning the meaning of 'employer' as that term is used in Title IV of ERISA with respect to withdrawals from multiemployer pension plans. You note that in the garment industry a contractor is generally the common law employer of employees covered under the pension plan while a jobber or manufacturer, who contracts with the contractor for work to be performed, often has the obligation under its collective bargaining agreement to contribute to the pension plan based on such work. You wish to know which of these under the circumstances you describe is the employer for purposes of Title IV's withdrawal liability provisions.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



1985 WL 5057                                    **Page 4**
(Cite as: 1985 WL 5057, *3 (N.D.Ill.))

\*3 Section 4203(a) of ERISA provides that a withdrawal from a multiemployer plan occurs when an employer: (1) permanently ceases to have an obligation to contribute or (2) permanently ceases covered operations under a plan. Title IV does not define 'employer' for purposes of assessing withdrawal liability. However, Section 3(5) of Title I provides that employer 'means any person acting directly as an employer or indirectly in the interests of an employer, in relation to an employee benefit plan . . .' (emphasis supplied). In our view this is an appropriate definition for determining whether a business is liable under Title IV under the circumstances you describe. [FN4] Thus, a jobber or manufacturer that has an obligation to contribute has withdrawn from a plan when its obligation ceases or it ceases covered operations. If a withdrawal should occur, the amount of the jobber/manufacturer's allocable share of unfunded vested benefits would be determined under Section 4211 based on the contributions it was required to make to the plan.

Likewise a contractor which has an obligation to contribute will be liable if it ceases to have such an obligation or ceases covered operations. This will be true even though one or more jobber/manufacturers also have an obligation to contribute on behalf of the contractor's employees and even though the jobber/manufacturers generally make such contributions. The amount of the contractor's liability, however, is based on the contributions it was actually required to make. Thus, in a case where the jobber/manufacturers made all contributions and the contractor was required to make none, the contractor's allocable share under Section 4211, and thus its withdrawal liability, would be zero.

I hope this has been of assistance. If you have further questions, please contact of my staff at the above address or at (202) 254-4873.

Sincerely,

Henry Rose

General Counsel

FN1 Because § 1002(5) applies, the arguments ASC and Burlington make based on other definitions of employer need not be addressed.

FN2 Given this conclusion, the court need not address the parties' arguments concerning the factually very similar case of Central Pennsylvania Teamster's Pension Fund v. Service Group, Inc., 6 E.B.C. 1491 (E.D.Pa. 1985). Though that case states that § 1002(5) is the proper definition of 'employer' the court did not apply the statutory language directly but rather followed something like the common-law rules.

FN3 The letter is attached hereto as appendix A. It is worth noting that the letter (at page 1 n.\*) confirms this court's decision that the definition of § 1002(5) applies to subchapter III.

FN4 Title I definitions are limited '[f]or purposes of this title'; thus, they are not necessarily applicable to Title IV. See Nachman v. PBGC, 446 U.S. 359, 370 and n.14 (1980). However, in the absence of an express Title IV definition or regulatory guidance by PBGC, guidance may be sought in Title I where it does not conflict with the purposes of Title IV.

1985 WL 5057, 1985 WL 5057 (N.D.Ill.)

**END OF DOCUMENT**

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



DEC 22,2003                                                           Page    5

## WestCheck Billing Report

**Total Number of Requests:**                    1

Find Documents:                      1

---

**Client Identifier:**    580495-00003/PS
**Date of Request:**    12/22/2003

---

                     Time for this Identifier
                    ================================
                       Net Elapsed          Billable
                         Time                 Time
                       -----------          --------
    Connect/Comm     0:00:00               0:00:00

    Note:   The Time for this Identifier excludes
            offline transmission time.



*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*

1553390-SCHREIBER, PHILL

DATE AND TIME PRINTING STARTED:       12/22/2003        01:22:13 pm (Central)

DATE AND TIME PRINTING ENDED:         12/22/2003        01:22:15 pm (Central)

OFFLINE TRANSMISSION TIME:                              00:00:02

NUMBER OF REQUESTS IN GROUP:                   1

NUMBER OF LINES DELIVERED:                   211

*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*



2003 WL 22928873                                                      **Page 18**
--- F.3d ---
(Cite as: 2003 WL 22928873 (7th Cir.(Ill.)))

Only the Westlaw citation is currently available.

United States Court of Appeals,
Seventh Circuit.

Michael RIZZO and Louise Rizzo,
Plaintiffs-Appellants,
v.
PIERCE & ASSOCIATES, Defendant-
Appellee.

No. 02-4129.

ARGUED Nov. 5, 2003.
DECIDED Dec. 12, 2003.

Mortgagor brought action against mortgagee, alleging that mortgagee unlawfully charged post-acceleration, pre-reinstatement late fees on the mortgage loan, in violation of the Fair Debt Collections Practices Act (FDCPA). The United States District Court for the Northern District of Illinois, Charles R. Norgle, Sr., J., 2002 WL 31497353, granted summary judgment in favor of mortgagee. Mortgagor appealed. The Court of Appeals, Bauer, Circuit Judge, held that: reinstatement clause of mortgage required mortgagor who sought reinstatement to pay late fees for each monthly payment missed prior to acceleration of the mortgage loan, and thus collection of such late fees did not violate the FDCPA.

Affirmed.

Williams, Circuit Judge, filed concurring opinion.

**[1] Contracts ☞ 176(2)**
95k176(2)
Interpretation of an unambiguous contract is a question of law.

**[2] Contracts ☞ 143(2)**
95k143(2)
A contract term is "ambiguous" if it is subject to reasonable alternative interpretations.

**[3] Contracts ☞ 143(1)**

95k143(1)
If the language of the contract unambiguously provides the answer to the question at hand, the inquiry is over.

**[4] Mortgages ☞ 316**
266k316
Reinstatement clause of mortgage, requiring mortgagor who chose to reinstate mortgage to pay mortgagee all sums which would be due under the mortgage and note had no acceleration occurred, unambiguously required mortgagor who sought reinstatement to pay late fees for each monthly payment missed by mortgagor prior to acceleration of the mortgage loan, and thus collection of such late fees did not violate the Fair Debt Collection Practices Act (FDCPA); note expressly provided that mortgagor would be responsible for a late fee for each late monthly payment, and obligation to make monthly payments was retroactively applied when mortgagor sought reinstatement. 15 U.S.C.A. § 1692f.

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 02 C 1992--Charles R. Norgle, Sr., Judge.

Daniel A. Edelman, Edelman, Combs & Latturner, Chicago, IL, for Plaintiffs-Appellants.

Stephen R. Swofford, David M. Schultz, Hinshaw & Culbertson, Chicago, IL, for Defendant-Appellee.

Before FLAUM, Chief Judge, and BAUER and WILLIAMS, Circuit Judges.

BAUER, Circuit J.

*1 The plaintiffs brought this action under the Fair Debt Collections Practices Act (FDCPA) claiming that defendant unlawfully charged post-acceleration, pre-reinstatement late fees on a mortgage loan because the mortgage and note did not unambiguously authorize the late fees. We find the collection of those late fees to be lawful and affirm the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



2003 WL 22928873
(Cite as: 2003 WL 22928873, *1 (7th Cir.(Ill.)))

**Page 19**

district court's grant of summary judgment in favor of defendant.

## BACKGROUND

Plaintiffs, Michael and Louise Rizzo, obtained a home mortgage loan and signed a promissory note on the mortgage. Some time after signing both of these documents, the Rizzos failed to make their required monthly payments. The loan was accelerated and an action for foreclosure was ultimately filed. Plaintiffs invoked their right under the mortgage to reinstate. They paid all of the fees and expenses necessary to reinstate their loan. The action to foreclose was dismissed. Plaintiffs then requested an account history. When they received the account history, they discovered that they had paid a late charge on the post-acceleration to pre-reinstatement period. The plaintiffs then filed this action in order to obtain what they call "unlawful post-acceleration late charges." Defendant's motion for summary judgment was granted and the plaintiffs' motion was denied. Plaintiffs filed this appeal.

The relevant portions of the note are as follows:

3.) Payments
I will pay principal and interest by making payments each month of U.S. $674.88 ....

4) Borrower's Failure to Pay as Required

(A) Late Charges for Overdue Payments
If the Note Holder has not received the full amount of any of my monthly payments by the end of fifteen calender days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.0% of my overdue payment ...
...

(C) Default
If I do not pay the overdue amount by the date stated in the notice described in (B) above, I will be in default. If I am in default, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest

that I owe on that amount
....

(D) Payment of Note Holder's Cost and Expenses
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all of its costs and expenses to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.
(R. on Appeal at 18.) The relevant portions of the Mortgage are as follows:

17.) Acceleration, Remedies:
... Lender, at Lender's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclose this Mortgage by judicial proceeding. Lender shall be entitled to collect in such proceeding all expenses of foreclosure, including, but not limited to, reasonable attorneys' fees and costs of documentary evidence, abstracts and title reports.

18.) Borrower's Right to Reinstate
*2 Notwithstanding Lender's acceleration of the sums secured by this Mortgage due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued at any time prior to entry of a judgement enforcing this Mortgage if: (a) Borrower pays Lender all sums which would be then due under this Mortgage and the Note had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage....
(R. on Appeal at 18.)

## DISCUSSION

[1][2][3] This court reviews a district court's ruling on a motion for summary judgment de novo. Weinberger v. State of Wisconsin, 105 F.3d 1182, 1186 (7th Cir.1997). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



law. Id. Interpretation of an unambiguous contract is a question of law. Bechtold v. Physicians Health Plan of N. Ind., Inc., 19 F.3d 322, 325 (7th Cir.1994) (citing Ryan v. Chromalloy Am. Corp., 877 F.2d 598, 602 (7th Cir.1989)). "A term is ambiguous if it is subject to reasonable alternative interpretations." Hickey v. Staley Mfg., 995 F.2d 1385, 1389 (7th Cir.1993) (quoting Taylor v. Continental Group, 933 F.2d 1227, 1232 (3d Cir.1991)). Therefore, "if the language of the contract unambiguously provides the answer to the question at hand, the inquiry is over." LaSalle Nat'l Bank v. Service Merchandise Co., 827 F.2d 74, 78 (7th Cir.1987).

Plaintiff cites to sixteen cases in an attempt to support his position that post-acceleration late fees are unlawful. [FN1] These cases uniformly stand for the proposition that a lender cannot demand payment of late fees for failure to make monthly payments after the loan has been accelerated. However, not one of those cases address the issue before us today. The distinguishing characteristic of this case is the fact that the plaintiffs reinstated the note and mortgage.

[4] The note provides for late fees when a monthly payment has not been made within fifteen days of the date on which it was due. (R. on Appeal at 18.) The reinstatement provision of the mortgage language requires payment of all sums "which would then be due ... had no acceleration occurred." (R. on Appeal at 18; emphasis added.) The effect of this, from the plain language of the instrument, is retroactive. In other words, the monthly payments are deemed to have been due each and every month on the dates set out in the mortgage and note. We find this language to unambiguously require plaintiffs to pay the late fees. Frederick v. Prof'l Truck Driver Training Sch., 328 Ill.App.3d 472, 481, 262 Ill.Dec. 535, 765 N.E.2d 1143 (1st Dist.2002) (where the terms of a contract are clear and unambiguous, they must be enforced as written). It is undisputed that the Rizzos did not make a certain number of monthly payments. Because of this failure, foreclosure was sought. In order to avoid foreclosure, the Rizzos reinstated the mortgage. In so doing, plaintiffs had to pay "all sums which would be then due under this Mortgage and the Note had no acceleration occurred." (R. on Appeal at 18.)

*3 Plaintiffs repeatedly argue "if late charges are tied to overdue 'monthly payments,' the absence of any 'monthly payment' obligation after acceleration and before reinstatement precludes the imposition of late charges for that period." (Br. of Appellants at 17.) This argument is flawed in that it claims there is an absence of an obligation to make monthly payments after acceleration. While this may be the case when the borrower does not seek to reinstate, it is not the case here. As discussed above, it is clear that the obligation to make monthly payments is retroactively applied when the borrower seeks to reinstate. Since the plaintiffs reinstated their mortgage, monthly payments became retroactively due. Plaintiffs' argument fails on its face.

The plaintiffs claim that the collection of late fees under this mortgage and note violates the FDCPA. The FDCPA prohibits using "false, deceptive, or misleading representation[s] or means in connection with the collection of any debt" and "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. This includes the "collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law. Id. (emphasis added). We cannot find any false or misleading representations nor can we deem the collection of late fees unfair or unconscionable. The terms of the note and mortgage explicitly require payment of all sums which would then be due had no acceleration occurred. We hold that defendants have not violated the FDCPA.

It should be noted that the Rizzos are not obligated to pay the late fees in all cases. If, for whatever reason, the Rizzos did not want to pay the late fees, they were free to pay the loan as accelerated. Such a payment would nullify any obligation to pay post-acceleration

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

late fees.

Reinstatement essentially allows the borrower a second "bite at the apple." It follows that the lender should not be penalized, nor the borrower rewarded, for a breach on the part of the borrower.

### AFFIRMED

WILLIAMS, Circuit Judge, concurring.

The Rizzos missed monthly payments and failed to pay late fees associated with those missed payments, which prompted Fairbanks Capital to accelerate their mortgage and hire Pierce & Associates to institute a foreclosure action. Had the Rizzos sought to reinstate their mortgage within 90 days as Illinois law provides, see 735 ILL. COMP. STAT. 5/15-1602; Colon v. Option One Mortgage Corp., 319 F.3d 912, 919 (7th Cir.2003), reinstatement could have been "effected by curing all defaults then existing " at the time of reinstatement. 735 ILL. COMP. STAT. 5/15-1602 (emphasis added). Because the Rizzos did not elect to reinstate within the statutorily prescribed period, their efforts to do so were governed by the terms of their agreement with Fairbanks Capital rather than Illinois mortgage law.

*4 Had the Rizzos attempted to reinstate during the statutory period, they would have been required to pay only the monthly payments and late fees that they had failed to pay in the months prior to acceleration, and to bring their loan current by paying Fairbanks for the monthly payments that would have come due between acceleration and reinstatement had acceleration never occurred. See RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 8.1 cmt. e (1997). The majority's opinion should not be read to hold borrowers liable for late fees on the monthly payments that would have come due in the intervening months had acceleration never occurred, if they sought to reinstate their mortgage during the statutorily prescribed period. Such borrowers would not be in default on any of these "missed" monthly payments because they would never have been obligated to make those payments during the post-acceleration pre-reinstatatement period (i.e., acceleration stops the payments from actually coming due). It would follow then that they could never have "failed" to make those payments. [FN1] See, e.g., Sec. Mut. Life Ins. Co. of N.Y. v. Contemporary Real Estate Assocs., 979 F.2d 329, 331 (3d Cir.1992); see also cases in majority opinion at note 1. [FN2]

The Rizzos' situation is governed by the terms of their mortgage rather than Illinois mortgage law. The majority's opinion should not be read to allow debt collectors to collect unauthorized fees from borrowers who properly exercise their statutory right to reinstate their mortgage, which would violate the FDCPA, see 15 U.S.C. § 1692f(1). For the foregoing reasons, I respectfully concur in the judgment of the court.

FN1. 1) Berkley Federal v. Ogalin, 48 Conn.App. 205, 708 A.2d 620 (Conn.App.Ct., 1998); 2) Cadle Co. v. Ginsburg, 1997 WL 535249 (Conn.Super.Ct., 1997); 3) Centerbank v. D'Assaro, 158 Misc.2d 92, 600 N.Y.S.2d 1015 (N.Y.Sup.Ct., 1993); 4) Crest S. & L. Ass'n v. Mason, 243 N.J.Super. 646, 581 A.2d 120 (N.J.Super.Ct. Ch. Div., 1990); 5) FDIC v. M.F.P. Realty Ass'n, 870 F.Supp. 451 (D.Conn., 1994); 6) FDIC v. Napert-Boyer Partnership, 40 Conn.App. 434, 671 A.2d 1303 (Conn.App.Ct., 1996); 7) FNMA v. Mebane, 208 A.D.2d 892, 618 N.Y.S.2d 88 (N.Y.App.Div.2d Dept., 1994); 8) Ford v. Statts, No. 88-6935, 1998 WL 1184108 (Super.Ct.Mass.Middlesex.Feb. 17, 1998); 9) Fowler v. First Fed. S. & L. Ass'n, 643 So.2d 30 (Fla. 1st DCA 1994); 10) In re Tavern Motor Inn, Inc., 69 B.R. 138 (Bankr.D.Vt.1987); 11) Manhattan & S. Savings & Loan Ass'n of New York v. Massarelli, 42 A. 284 (N.J.Super.Ct. Ch. Div.1899); 12) Monument Realty, Inc. v. Youmatz, 18 Conn. L. Rptr. 589 (Con.Super.Ct.1997); 13) RTC Mortgage Trust 1995-S/N 1 v. J.I. Sopher & Co., 96 CIV 4992, 1998 WL 132815 (S.D.N.Y. Mar.24, 1998); 14) Security Mutual Life Ins. Co. of New York v. Contemporary Real Estate Assocs., 979 F.2d 329 (3d Cir.1992); 15) Shadhali, Inc. v. Hintlian, 41 Conn.App. 225, 675 A.2d 3 (Conn.App.Ct., 1996); 16) SKW Real Estate LP v. Gallicchio, 49 Conn.App. 563, 716 A.2d 903

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



(Conn.App.Ct.,1998).

FN1. To hold otherwise would effectively reinstate those "missed" monthly payments retroactively to the date they would have been due (but for acceleration) and then to declare the borrowers in default on those payments for failing to make them on those dates in the past. This would contravene the express statutory language and would not be supported by any existing law. It would also be presuming that those reinstating borrowers would have failed to timely make those "missed" payments had acceleration not occurred, yet reinstatement wipes clean the borrowers' slate with respect to all of the missed payments which prompted acceleration in the first place. 735 ILL. COMP. STAT. 5/15-1602; Colon, 319 F.3d at 919 ("Reinstatement leaves the mortgage documents in place as if no default or acceleration had occurred.").

FN2. If borrowers attempt to cure their defaults post-acceleration by paying the missed monthly payments and the late fees that were due at the time of acceleration, and any post-acceleration monthly payments necessary to make their loan current, lenders are likely obligated in equity to accept the payments and reinstate the mortgage. See Fed. Nat. Mortgage Ass'n v. Bryant, 62 Ill.App.3d 25, 18 Ill.Dec. 869, 378 N.E.2d 333, 336 (Ill.App.Ct.1978).

2003 WL 22928873 (7th Cir.(Ill.))

**END OF DOCUMENT**

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



DEC 22,2003                                              Page    23

## WestCheck Billing Report

**Total Number of Requests:**              3

   Find Documents:              3

---

**Client Identifier:**   580495-00003/PS
**Date of Request:**   12/22/2003

---

### Time for this Identifier
```
================================
    Net Elapsed          Billable
       Time                Time
  -----------          --------
```
Connect/Comm   0:00:02              0:00:02

Note:  The Time for this Identifier excludes
       offline transmission time.



*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*

1553390-SCHREIBER, PHILL

| | | |
|---|---|---|
| DATE AND TIME PRINTING STARTED: | 12/22/2003 | 01:17:37 pm (Central) |
| DATE AND TIME PRINTING ENDED: | 12/22/2003 | 01:17:49 pm (Central) |
| OFFLINE TRANSMISSION TIME: | | 00:00:12 |
| NUMBER OF REQUESTS IN GROUP: | 1 | |
| NUMBER OF LINES DELIVERED: | 1190 | |

*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*



## CERTIFICATE OF SERVICE

I, the undersigned attorney, depose and state, that I served a copy of Plaintiff Transpersonnel, Inc.'s Memorandum of Law in Support of Its Motion for Summary Judgment, via U.S. mail from 131 S. Dearborn Street, 30th Floor, Chicago, Illinois 60603, on this the 22nd day of December, 2003 upon the following attorneys of record:

James H. Hanson
Scopelitis, Garvin, Light & Hanson
10 West Market St., Suite 1500
Indianapolis, IN 46204


William D. Brejcha
Scopelitis, Garvin, Light & Hanson
120 South LaSalle St., Suite 1700
Chicago, IL 60603


Phillip M. Schreiber
HOLLAND & KNIGHT LLC
131 South Dearborn, 30th Floor
Chicago, Illinois 60603
312-263-3600